**SOCIETE ANONYME DES MANUFAC-
TURES DE GLACES & PRODUITS
CHIMIQUES DE SAINT–GOBAIN, CHAU-
NY & CIREY v. COE, Commissioner of
Patents.**

No. 7884.

United States Court of Appeals for the
District of Columbia.

Decided Oct. 19, 1942.

Mr. Vernon M. Dorsey, of Washington, D.C., submitted for appellant.

Mr. W. W. Cochran, Solicitor, United States Patent Office, of Washington, D.C., submitted for appellee.

Before STEPHENS, EDGERTON, and RUTLEDGE, Associate Justices.

STEPHENS, Associate Justice:

This is an appeal from a judgment of the District Court of the United States for the District of Columbia dismissing the appellant's action brought under Rev.Stat. 1875, § 4915, 35 U.S.C.A. § 63, to authorize the Commissioner of Patents to issue to the appellant a patent containing claims 5, 6 and 7 of application Serial No. 18,092, filed April 25, 1935, by Bernard Long, and thereafter assigned to the appellant. Claim 5 which is typical reads as follows:

"5. A method of hardening a cup-shaped glass element having a convex outer surface, a concave inner surface rounded surfaces joining said convex and concave surfaces, comprising hardening the said element while having the described shape and while heated to a proper hardening temperature by simultaneously cooling both its outer and inner surfaces, the concave surfaces being more rapidly cooled than the convex surface."

We print claims 6 and 7 in the margin.[1]

The Long application discloses a process for hardening glass fixtures to be imbedded in concrete structures for the purpose of transmitting light. The fixtures are of two shapes: one, that of an inverted saucer,

---

[1] "6. A method of hardening a cup-shaped glass element having a convex outer surface, a concave inner surface rounded surfaces joining said convex and concave surfaces, comprising hardening the said element while having the described shape and while heated to a prop- er hardening temperature by simultaneously cooling both its outer and inner surfaces, the cooling on the convex surface being due to exposure to air and the cooling on the concave surface being due to air currents blown against the same.

"7. A method of hardening a cup-

the other, that of an inverted cup. The purpose of the process is so to condition the fixtures that they will be able to withstand, without cracking or breaking, various stresses to which they are subjected by rapid fluctuations in temperature and by the surrounding concrete material. The process consists essentially of heating a fixture to a proper hardening point and then cooling the concave surface more rapidly than the convex.[2] Long describes two ways of carrying out the process. One consists of heating a fixture to a proper hardening point and then cooling its concave surface by forcing an artificially stimulated current of air against it, at the same time cooling the convex surface by exposure to ordinary air. The other consists, after the same heating of a fixture to a proper hardening temperature, of cooling both surfaces simultaneously by artificially stimulated air currents of different intensities, the current applied to the concave surface being of greater intensity than that applied to the convex.[3]

The Commissioner contended below that the Long process is not inventive in view of Patent No. 1,454,200 issued May 8, 1923, to Wells and Tillyer. That patent covers a process designed to produce "protection lenses" or "goggles" so that the convex surface thereof will withstand comparatively heavy blows without shattering or breaking. The lens, after having been polished, is heated to a softening point in which it is given a concavo-convex shape. At this point the convex surface is cooled by forcing an artificially stimulated current of air against it, at the same time allowing the concave surface to cool naturally, that is, by exposure to ordinary air. In their specification Wells and Tillyer explain the purpose of the cooling step thus:

". . . [By this step] the convex surface of the lens will be quickly cooled which will cause the same to contract, set and harden while the . . . concave surface of the lens is in a softened state.

"Attention is called to the fact that when the soft surface on the concave side of the lens begins to cool it will slowly tend to produce a pulling on the hardened convex surface of the lens producing a compression in the convex surface . . . of the lens and a tension in the concave surface . . . of the lens.

\* \* \*

"In the art of manufacturing glass it is a well known fact that glass under compression is much stronger than glass under tension and it is, therefore, one of the principal objects of our process to produce compression upon the convex surface of the lens with a tension in the concave surface as it is the convex surface of the lens which must withstand any blows."

The trial court made findings of fact which, after describing the appellant's process and that of Wells and Tillyer, were as follows:[4]

---

shaped glass element having a convex outer surface, a concave inner surface rounded surfaces joining said convex and concave surfaces, comprising hardening the said element while having the described shape and while heated to a proper hardening temperature by simultaneously cooling both its outer and inner surfaces by air currents of different intensities directed against said surfaces to cool the concave surface more rapidly than the convex surface."

[2] The Long application does not explain what is meant by the phrase "hardening point" used therein, but the testimony at the hearing below of the appellant's witness Phillips shows that the phrase has reference actually to a temperature point slightly above the "softening point" of glass. The explanation of this seeming paradox lies in the fact that the hardening, i. e., tempering, of a glass article, is accomplished by re-heating it, after it has once been formed, to a temperature slightly above its softening point, and then rapidly cooling it.

[3] Long asserts in his application that prior to the perfecting of his process glass fixtures of the type under discussion were hardened by "uniformly cooling the same" and that this method was unsatisfactory because it had the effect of increasing the "inner forces developed within them." It appears that by the phrase "uniformly cooling the same" he means that both surfaces of the fixtures were cooled by exposure to the same cooling agency, i. e., that the two surfaces were not differentially cooled. But he does not explain what he means by the phrase the "inner forces developed within them." Moreover, he nowhere sets forth the reason why his process will, as asserted, produce better fixtures than those produced by the methods of the prior art except that he states that the fixtures he produces "have a much greater resistivity against mechanical force and against variations in temperature than articles known in the prior art."

[4] There were additional findings but they are not pertinent on this appeal.

."7. In the methods claimed by plaintiff and in the method disclosed by Wells and Tillyer, the result is the same, namely, the more rapid cooling and hardening of that surface of the glass element against which the current or stronger current of air is directed.

\*     \*     \*

"9. In view of the Wells and Tillyer patent it was not invention to harden a glass element of the form claimed, by directing a current of air against the concave side thereof, nor was it invention to harden a glass element of the form claimed by directing a current of air against the convex surface thereof and a current of greater intensity against the concave surface thereof."

The trial court concluded that the appellant was not entitled to a patent.

On this appeal the appellant's contention is that the Long process differs from that of Wells and Tillyer in that the latter over-tempers the convex surface of a concavo-convex glass element whereas Long over-tempers the concave surface of a concavo-convex glass element. It is urged that this difference involved invention over the Wells and Tillyer process, in that nothing in the latter suggested that any useful effect would be produced by over-tempering the concave surface since Wells and Tillyer had in view only the strengthening of their glass element against blows delivered on the convex side.

But we think the trial court soundly concluded that there is no invention in Long over Wells and Tillyer. Wells and Tillyer and Long both dealt with similarly shaped glass elements. Wells and Tillyer realized that the blows to which their glass element would be subjected would require it to be over-tempered on its convex surface. Long knew that the stresses and changing temperatures to which his element would be subjected would require it to be over-tempered on the concave surface. Both therefore had the same problem, that of over-tempering one surface of a concavo-convex glass element. Wells and Tillyer taught that this could be done by differential cooling through the use of an artificially stimulated current of air. Exactly this process was used by Long.

It is true that Long, before he could make use of the Wells and Tillyer process, had to have in mind the idea of the end to be accomplished, to wit, the tempering of his glass element so that it would withstand the stresses and temperature changes to which it would be subjected when imbedded in concrete, and that Wells and Tillyer taught nothing in respect of that. But the appellant is not seeking a patent, indeed could not obtain one, for his understanding of the end to be accomplished, but only for the means, *i. e.*, the process for the attainment of the end.[5] To hold that to direct a current of air upon one surface of a glass element of a given shape for the purpose of over-tempering it involves novelty and invention when the prior art disclosed a process of directing a current of air, for the same purpose, upon the opposite surface of a similarly shaped glass element, would be to allow a patent for a mere change in the direction of the current of air.

Affirmed.

---

[5] ". . . it is apparent that an invention, considered in itself, is neither an end nor a combination of both means and end, but is a means for the attainment of an end; and though the idea of means cannot be contemplated by the mind apart from the idea of end, the end must be referred to only for the purpose of more fully comprehending the real nature of the means employed. An art or process, for example, is a means devised for the production of a given result. Its essence, the creative thought which it expresses, may be more clearly ascertained by studying the result accomplished than by examining the means itself in actual operation; but as an art or process it is complete, apart from any end which it achieves. . . ." 1 Robinson on Patents (1890) § 90. See also §§ 87-9.